United States v. Michael Free Mr. Dietz? Thank you, Your Honor. My name is Martin Dietz and I represent the appellant, Michael Free, in this matter. At this time, Your Honors, I would ask respectfully to reserve three minutes of my argument time for rebuttal. Your Honors, we were directed to confine our own loss calculation under Section 2B1.1 of the Sentencing Guidelines. There is no question in this case that the issue in this case was not actual loss. As the government even contended in its brief and acknowledged that the only issue in this case is the intended loss in this case. To be sure, Mr. Free filed bankruptcy and to be sure, he was convicted of concealing a number of assets. So, Mr. Dietz, why don't we look to 2B1.19 that specifically references bankruptcy and actually started at 10 and not at 6. You don't refer to that in your brief. I don't refer to that in my brief, Your Honor, most likely because it wasn't raised in the lower court. The district court found that the base offense level was 6. But doesn't that directly speak to what we're talking about? If the offense involved goes on to fraudulent action during the course of the bankruptcy proceeding, it's a 10. Judge, that's correct. There's no correctness to what the guidelines say. The government never objected to that in this case. The probation officer determined that the base offense level was a 6. But is the correct offense level 10? Well, Judge, it may be. It may be. Even if it were a 10 in this case, Judge, I still think the advisory guidelines are still lower than what they were. And I still think the district court erred in calculating the loss in this case. Well, I understand what you're saying, but why isn't it a 10? Well, Judge, the fact of the matter is, I didn't object to it. It was more favorable to my client than the district court. The government certainly didn't object to it, and the district court didn't acknowledge it. That's where we are. Even if you're correct and it should be a 10, the guideline range would still be substantially lower than it was. Also, so we're clear, I do recognize that the district court granted a substantial variance in this case. I'm not in a position to stand here and argue and say, the guideline range calculated in this case was 41 to 51 months. And even if it were a 10, it would be substantially lower than that. But the fact is, it's contained in the second supplemental appendix. In the opinion the district court wrote in response to our motion for bail pending appeal, acknowledged that if we're correct, if the sentencing guideline base offense level did start at a 6, and I'm correct in this appeal, the sentence in this case would likely be in the 0 to 6 months range. So at least from the district court's perspective, if we're correct on the amount of loss in this case, the sentence could be substantially lower, even probation in this case. What was the amount that the district court determined as a loss? Was it 650,000? Is that correct? Judge, the district court actually did not calculate a precise amount of loss. What the district court did in this case was it took the amount of debt listed in the original bankruptcy petition, which I believe is about $671,000, which we dispute should have been considered at all. He also included an amount of $350,000, which he believes were made from post-bankruptcy sales of assets by my client. He also included another $100,000 from other sales that, quite frankly, I'm not sure where that number came from. The district court in sentencing said, regardless of what the actual amount is, I believe it's in excess of $1 million. Isn't that consistent with the charge? I mean, if you look at paragraph 11 of the indictment, it says that your client knowingly and willfully devised and intended to devise a scheme to defraud the bankruptcy court, his credit is in the bankruptcy trustee. So regardless of whether there was any loss or not, his intent was to defraud the bankruptcy court. I think the jury's verdict reflects that as well, and I'm not in a position... So isn't it the intended loss, then? No, I don't agree, Judge, and especially because when you look at this case, the evidence of record suggests that when Michael Free filed bankruptcy, he filed for one reason. That was to stave off sheriff sales of his two commercial properties. The trustee testified to that, Mr. Free testified to that, and one additional fact that I think is germane is one of the FBI agents in this case testified at trial that at the time of the initial search, Mr. Free had no idea that he was under investigation. Mr. Free was asking, what was this all about? I declared assets way in excess of any debt I had. Now, getting back to your point, he did declare in his initial statement $671,000 worth of debt. That was substantially overstated. $650,000 worth of that debt was a mortgage he had on commercial property. S&T Bank eventually withdrew their claim. They negotiated a settlement with the trustee in this case and withdrew their claim. You don't dispute that he committed fraud, that he committed deceit upon the bankruptcy court? Well, Your Honor, my brief does challenge the sufficiency of the evidence. It's hard to get you to say yes. But it seems clear from the record that he deceived the bankruptcy court. I will agree with you that the record contains substantial evidence that With respect to guns that he sold on the side and went back to the claim. Right. You're saying that that doesn't constitute loss with respect to any credit. Is that correct? That's correct in this case because the record's clear. The bankruptcy trustee testified that at the end of the day there were $88,000 worth of claims. What I'd like to get to is why can't the sentencing judge consider the fraud and deceit at the time of sentencing rather than focus solely on whether the creditors were made whole or not? Because under the guidelines, intended loss is pecuniary harm a defendant purposely sought to inflict. Monetary harm. I agree with you he could be punished for what he did. He could be punished for the fraud. He could be punished for lying under oath. You mean in a separate case? No. The base offense level takes that into consideration. We have a crime. Under the guidelines, there's a base offense level. You commit bankruptcy fraud, you're facing a level 6 or a level 10, wherever you are. The conduct is subsumed. Now, to determine the extent of the sentence, whether it's hands and supply, we now look to the amount of loss. So what you're saying is that the loss is zero, but the judge can consider fraud and deceit by varying? Absolutely. He had a number of different options there. But what about a circumstance? There were two cases, and I'm thinking, and I don't know if you know them because they're not from this circuit. One is U.S. v. Mitchell. The other is U.S. v. Hughes. One's from the 8th Circuit. One's from the 4th Circuit. And it appears from those cases that when the district courts there were looking at the intended loss to be caused by the defendants in those cases, at least in one of the cases, the court specifically looked at what was the goal of the defendant. The goal of the defendant there was to preserve his assets, to not make them available in some way to conceal them, so that they couldn't be liquidated. And under those circumstances, the district court awarded a loss value commensurate with the concealed value of concealed assets. Do you follow me? Okay. Judge, I know those cases, and I will comment on both of those cases. All right. Now, if that is what, and remember, Feldman talks about amount of loss intended or gain the defendant sought to achieve by virtue of their criminal activity. Why doesn't that test work here? Well, for two reasons. Number one, Michael Freeh filed a Chapter 13 bankruptcy. Yeah, I saw that in your briefing. But he didn't comply with that. He didn't give the liquidation plan. It got put in Chapter 7, so we're in Chapter 7 land. But we're talking about his intent. What was his intent when he filed those schedules and concealed assets? His intent at that time was to reorganize his debt, retain his assets, pay, he believed that he claimed sufficient assets in those schedules that were going to take care of any reorganization plan, any creditor. I mean, frankly, he claimed over a million dollars in assets and had $88,000 in debt. Even bankruptcy trustees said that's the exception, not the way. He couldn't figure it out. And at trial, I even asked him, if you were his lawyer, would you file bankruptcy? And his answer was absolutely not. But the lack of candor continued into the Chapter 7 proceedings. So I don't know we can really fix the time that when he filed the petitions, it's different than what he did after the Chapter 7. I don't dispute that. But to specifically talk about Hughes and Mitchell, the important fact in both of those cases, the creditor's claims substantially outweighed the assets he concealed. So it's your position, then, that in those cases, he got the benefit of the concealed assets, got a lesser loss. Well, I mean, in those cases, right. I mean, in our case, and by the way, in Feldman, you bring up Feldman. Feldman, that defendant, concealed just over $200 and some thousand dollars worth of assets. And I'll strike that. I'm wrong. He had just over $200,000 worth of debt, concealed assets. The unique thing about Feldman is at the end of the day, he concealed over $1.4 million in assets at Feldman. So it sounds like a perfect Michael Freed case that he concealed $1.4 million, owed $200,000. The problem is, at the end of the day, Feldman doesn't explain why. Creditors only got paid $0.34 on a dollar at Feldman. So, and, let's see, the district court did not tell, or the Third Circuit, this court did not tell the district court, use the concealed assets as a basis of loss. The basis of loss in Feldman was the amount of debt. You mean the debtors could have been made whole in Feldman? Well, I don't, the opinion doesn't discuss that. It just says he concealed $1.4 million. The debt was $200,000, but the creditors only got paid $60,000-some thousand at the end of the day. And I don't know why that happened, but. Let me ask you, under your logic, that as long as the debtor discloses enough assets to cover the debt, it's okay for him to hide other assets? No. He'll be punished for it. Shouldn't he be punished for it, commensurate with the assets he's hiding, which was charged here, and intended to devise a scheme to defraud the bankruptcy court? It makes practical sense, but under the guidelines, the guidelines says, what is the pecuniary harm he sought to inflict? What is the monetary harm he sought to inflict? In this case, there was never a chance that the creditors weren't getting paid. Now, free is out on bail now, is it? Would he serve any time at all? Not on bail. So he's out on bail facing? 24 months. Maximum 24 months. He had a bail motion in the trial court, apparently expressed some reservations about the extent of the loss in this case. The district court was very thoughtful in this case, and he gave it a great amount of thought, even though I disagree with his end result. I believe in his opinion, he called it a close call. And acknowledged this could go the other way. Well, you said 20 months. I thought he was facing 6 to 12. No, Judge. His guideline range. Oh, his guideline range. The advisory guideline range was 41 to 51 months. The district court varied. Varied downward. Varied downward to 24 months. Of course, if the guideline range were lower, he could vary upwards. Well, he could, but the district court even indicates, in his opinion, that if I'm correct here today, there's a chance that his sentence could be substantially lower. Okay. Thank you. We'll get you back on your money. Ms. Irwin. Thank you, Your Honor. Laura Irwin from the U.S. Attorney's Office in the Western District of Pennsylvania on behalf of the government. The question before the court today is whether the district court correctly found that Michael Free intended and thought that his conduct would cause an injury, cause a financial injury to his creditors. The district court said yes, and that decision was correct. I'd like to start with sentencing. At sentencing, Mr. Free took the stand and was asked, did you intend to harm your creditors when you filed this bankruptcy? And he said no, I did not intend for them to have a loss. Wasn't there always sufficient funds to pay off whatever was owed to the creditors? How could there be a loss? As a matter of fact, Your Honor, the only reason the creditors were paid 100% on the dollar was because the fraud was discovered and concealed assets were liquidated to pay off those creditors. This is not like another – Feldman, of course, we don't know why they only got 37 cents on the dollar, but we do know here the only reason they got 100% on the dollar was because this fraud was discovered and concealed assets were liquidated to pay those creditors. The government bears, of course, the burden of proof on loss. That's correct. So tell me, because frankly it reads a little muddled, as to what loss figure the government is arguing, argued to the district court, argued to us, but the district court thought so. Tell us what, by a preponderance of the evidence, the government has proven to show what Mr. Free intended as the loss, or put differently, what he intended to gain as a result of this criminal conduct under Feldman. Let me just make sure I understand your question. Mr. Free's complaint on appeal is not with the calculation. Are you asking me to explain a calculation? His position is there's no loss. Right, and our position is that he did intend a loss. And so what is that loss? Because judges need to go through the ratcheted approach of calculating. So what is the loss the government contends Mr. Free intended? Well, at sentencing we advocated that it was in excess of a million dollars due to the amount of debt he sought to liquidate. Which was how much? About $640,000, as well as the value of various assets. One lump sum was about $350,000 for firearms that were sold, and there was another number that we presented, which was approximately $450,000 of guns that had been auctioned off. The district court ultimately determined that he would not include those, but he did say that this loss amount would be in excess of $1 million. So at that point we're at a range of like 51 to 68 months, I believe. The district court then goes and says, but I'm going to use, he does not explain why, but he says I'm going to use $500,000 to a million, which gets us to the next range. Then he goes to, when he actually imposes a sentence, he says, I'm going to give you an adjusted offense level of 16, without any explanation as to how he gets there. So it's not precisely clear what number the district court used when he got to that point. Do we have to remand as a result? I don't think so, because we know that Mr. Freeh's intent here was absolutely positively clear. Again, what was his intent? What was his intended loss? What was his subjective intent? Was it to beat the creditors? Was it to disrupt the bankruptcy system? Well, because he testified at sentencing, the only thing he said was, I did not intend to cause my creditors a loss. That was his opportunity to come forward with an explanation of what I intended to do. So we don't know what that is. And under Feldman, we get the presumption, because he did conceal assets. What presumption do we get? That he intended to cause a loss. There's a presumption for that? Don't you have to prove that? Yeah. We do. We get a presumption under Feldman that when a defendant conceals a large amount of assets, we have a presumption that he intended to cause a loss. The defendant then has the opportunity to come forward and say, no, I actually had a more benevolent reason. I wanted things to go more quickly, which was the case in Feldman. Here, Mr. Freeh said, I simply just did not intend to cause a loss. The district court heard a lot of other things from Mr. Freeh that day and found at the end his entire testimony to be incredible. So Mr. Freeh says, I didn't intend that. The district court says, I don't believe what you said. The notes to 2B1.1 focus almost extensively on pecuniary loss, actual loss, and the state that non-pecuniary harm, however serious, should be handled by upward departures. Why isn't that the case here? In other words, the judge can accomplish the same thing simply by resentencing and using an upward departure with respect to Mr. Freeh's deceit. I suppose that is a possibility, but that was never suggested or objected to here by the defendant, that that should be the process that was followed. But you're talking about pecuniary harm, aren't you? You're talking about actual harm, not abstract harm. Mr. Freeh has never taken the position that correct measure should be actual harm. His position has always been that it should be intended harm. I'd like to return back to the sentencing so the court can feel comfortable with what Mr. Freeh's intent was. At one point, the district court is questioning him about the day that the sheriff's office came to his home and found and retrieved 49 guns. The district court said to him, did you tell the deputies that there were more firearms? Did you tell anybody that there was more firearms? And Mr. Freeh responds, I told an associate at my lawyer's office, and he goes on to say, and this is at page 1115 of the record, and the impression I got was that they took a couple hundred thousand dollars of guns to settle any debt that remained that they could possibly sell those guns, and that was all they needed to take. I never hid guns from them. We know from that statement that his intent was that he knew that he would have to have liquidated concealed assets in order to pay his debts. Otherwise, he never would have said that I understood that they were taking them to pay off my debts. Are you familiar with the Mitchell Hughes case I asked you about, once from the 8th Circuit, once from the 4th Circuit? Yes. And it talks about, at least as I understood those cases, the intent of the defendant there was to preserve his assets, and that's why the judge used concealed assets. Is that our case? Is that the free case, or is there something different? Well, the district court did make a finding that he intended to conceal assets and he intended to cause a loss. That's at page 1122 of the record. I don't think that those cases are particularly apt, though, because of the fact pattern we have here, and the facts actually keep adding up to show his intent to cause a loss to his creditors. Let me just step back and say I think there is no doubt if he wanted me to argue that he concealed them in order to keep them, I could certainly support that. But to show his intent to harm his creditors, the list just goes on from his testimony. So are you advocating that the offense level adopted by the district court, the 14, is supported by the record because the intent was to deceive the creditors, and in this instance the value of the debt to be discharged was within the appropriate range, and that's 640 to 70 range. Do you mean the adjusted offense level of 16? Well, that's the problem. The district court said 14 and he said 16. But I'm asking you, does the record support the offense level at 14 based upon what you just said? You said that the intent of Mr. Freeh was to harm the creditors. We believe it does support that, and it's everything from his testimony at sentencing to his conduct throughout. As you pointed out when Mr. Deese was on the stand or talking, it's not just his intent the day he filed, it's his actions thereafter. It's his lying at the 341 meeting. It's his affidavit that he lied and said, I don't have any guns, I haven't sold any guns. It's his selling guns over the Internet. And I think another really important fact is he sold concealed weapons or concealed guns and took those assets to an auction run by the bankruptcy judge and was asked, once he started bidding, where are you getting this money? This is not assets of your bankruptcy estate, is it? And he said, no, I got this money from friends and family. He used that money to buy back assets. He didn't use that money to make sure creditors were paid. And the list goes on and on in his conduct. He was incarcerated by the bankruptcy judge. And the fact remains that the reason why creditors received 100% is because the bankruptcy fraud was discovered. Did the district court include the costs to the bankruptcy court, so to speak, in his calculations? And if so, is that appropriate? I don't believe that he did. He does make a reference to the amount of inflation that Mr. Bree's conduct caused the administrative costs to go up. But from my reading of the record, I don't believe that's the case because he goes and he talks about at the beginning the concealed losses and the amount of guns sold and the amount of debt. I don't believe that the record would support that, especially since he did end up at a lower adjusted offense level. So you're not saying they can't be considered. You're just saying in this instance the district court didn't make a finding that it should be considered. I don't believe it can be considered. I don't think that's probably a proper consideration, but I don't think it happened in this case, so it becomes a moot point. But the creditors were all compensated, all made whole completely. Isn't that the purpose of the issue of intended loss, to punish someone who steals away money and hides it so that the creditors would not be paid? I understand your point, Your Honor. But keep in mind, this bankruptcy remains open to this day. At sentencing, another creditor had come forward. Do we believe that when all is said and done, there will be enough money for every creditor? But the difference between the person who created... That would not factor in sentencing, Mr. Ferry. Right, that's correct, and it didn't. But the fact remains that the only reason the creditors here received 100% on the dollar was because the fraud was detected. This is not a case in which it is true that he had enough assets to satisfy them regardless. The only reason they were paid in full was because the fraud was discovered. The comment by the district judge said, in his view, the real victim in this case was the judicial system. And I tend to agree with that because Mr. Ferry lied and deceived the court with respect to assets. But that conduct, it seems to me, could be punished separately from the issue of the amount of intended loss, given that the creditors were all made whole. I'm not sure I understand your question. Are you saying it should be... It seems like that was the focus of the judge's concern, and maybe that's why he took that amount into account when he sentenced Mr. Ferry. Well, I do think that the district court focused on that, but keep in mind he talked about a variety of other things, not the least of which is Mr. Ferry's failure to take this seriously, to understand the seriousness of his offenses, because the district court had just sat there and had Mr. Ferry lie to him. Mr. Ferry said, you know, I was never told at the 341 meeting that I couldn't sell my guns. You know, I never lied about where the assets came when I went to the inventory auction. So we have a district judge who's sitting there and talking to someone who's not being frank and forthright. So I think it bleeds into, yes, there's an injury to the system, but there's also sufficient evidence in the record of a very long and detailed sentencing explanation given by the district court as to why this is the appropriate sentence, that some incarceration was required to emphasize the seriousness of the offense and to make Mr. Ferry understand the nature of his conduct. Could the judge's sentence have been justified consistent with the indictment where the government charged the scheme to defraud the bankruptcy court? I think that's a fair assessment, Your Honor. Why was there no discussion of 2B1.19 and that bankruptcy proceedings, the jumping-off point, so to speak, is 10? I don't have an answer to that. I don't know why they weren't discussed. We did point out in our brief, however, that if there was a resentencing, his range would not be zero to six months. It would be six to 12 months because that specific provision would kick in and require him to have a range of six to 12 months. I don't think there can be any reasonable dispute about if he went back for resentencing. That would be his range. Is there anything else the court would like me to discuss? Ms. Irwin, thank you very much. Thank you. We would ask that you affirm the judgment of the district court. Thank you very much. Mr. Dietz. Thank you. I would just like to address a few of the things that were just stated. The government just indicated that the only reason that the creditors were paid is because the fraud was detected in this case. That's absolutely not true. There were a number of assets. In fact, sales of assets that were disclosed on the bankruptcy petitions generated over $300,000. That's the money that was used to pay the creditors in this case. But weren't a lot of them bought by Mr. Freed himself using the concealed assets or was it a smaller percentage? No. I think roughly $30,000 was sold that did not involve Mr. Freed. The remainder did. The trial transcript will reflect, and it's pointed out in my brief, that the trustee acknowledged that even once he realized the money was coming from Mr. Freed, he took no action. Those sales went unchallenged. And what's germane about that is I believe roughly about $300,000 of those funds were generated from the sales of firearms. $250,000 of that was listed on his bankruptcy petitions. And the trustee was aware of the sales? Pardon? The trustee was aware of the sales? He was aware after the fact, Your Honor. But once he found out about it, he still went and challenged it. And the reason is, as the record will show, there is a substantial surplus in this case. There is money when this bankruptcy is done that's going back to Mr. Freed. That's a fact. It's in the record. At some point did he, out of the goodness of his heart, say, I've got enough money to pay these creditors? Well, the trustees had the money to pay the creditors for a while. I mean, I don't want to go off the record, but the trustee has had the money to pay. Well, the creditors have all been paid. They've been paid for years. There's a lot of machinations going on outside the record of this proceeding involving other parties and the reason the bankruptcy is not wrapped up. But the creditors had been paid for years, and that's in the record. He asked about Mr. Freed's intent. Taking away the fact that the judge found him incredible at sentencing, there's other evidence coming from the trustee that Mr. Freed said, the reason I filed this bankruptcy was to stay the share of sales on my commercial properties. The record in this case will show, and there's a motion in the appendix, it will show Mr. Freed was exactly right. He filed the Chapter 13 bankruptcy. The bank didn't care, revised that the bankruptcy was filed. S&T foreclosed on those properties, sent them to a share of sale. The trustee then intervened, took action, and said, hey, this should have been an automatic stay. And the trustee sued S&T, and they resolved this matter. The government indicated that he sought to liquidate $640,000 in debt. That's absolutely not true. Shortly after the bankruptcy was filed and S&T got involved, S&T took $600,000 of that debt with them when the trustee gave them the properties, and they walked away. And the record will indicate Mr. Freed had substantial equity in those properties at the time, too. The trustee walked away from those. Thank you, Your Honor. Mr. Deese, thank you very much. Mr. Irwin, thank you. Thank you both for a well-argued case, and we'll take the matter under advisement.